15-3372-cv
Funk v. Belneftekhim

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2016

(Argued:  December 9, 2016     Decided:  June 29, 2017)

Docket No. 15-3372-cv

VLADLENA FUNK, EMANUEL ZELTSER,

*Plaintiffs-Appellees,*

—v.—

BELNEFTEKHIM, AKA CONCERN BELNEFTEKHIM, BELNEFTEKHIM USA, INC.,

*Defendants-Appellants.*

Before:

CALABRESI, RAGGI, LYNCH, *Circuit Judges.*

Defendants appeal from an order of the United States District Court for the

Eastern District of New York (Cogan, *J.*) sanctioning defendants' continued

failure to comply with orders directing jurisdictional discovery. We identify no error in the district court's decision to order jurisdictional discovery or to sanction defendants' failure to comply. We conclude only that, while the initial monetary sanction fell within the district court's discretion, the subsequent sanction striking defendants' foreign sovereign immunity defense did not because it risked the district court's assumption of jurisdiction where it may have been lacking, something the court was not empowered to do, particularly where lesser sanctions were available.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

————————

KENNETH A. CARUSO (Christopher D. Volpe, *on the brief*), White & Case, LLP, New York, New York, *for Defendants-Appellants*.

EMANUEL ZELTSER, Sternik & Zeltser, New York, New York, *for Plaintiffs-Appellees*.

————————

REENA RAGGI, *Circuit Judge*:

In this action, originally filed in New York State court, plaintiffs Emanuel Zeltser and Vladlena Funk sue defendants Concern Belneftekhim ("BNTK") and Belneftekhim USA, Inc. ("BUSA") for their alleged roles in plaintiffs' 2008 abduction from London and their prolonged detention in Belarus by authorities

2

of that country.  After defendants removed the case to the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*), they moved to dismiss based in part on foreign sovereign immunity.  *See* Foreign Sovereign Immunities Act of 1976 ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1332(a)(2)–(a)(4), 1391(f), 1441(d), and 1602–1611).  Defendants here appeal from the October 20, 2015 order requiring defendants to pay earlier monetary sanctions that had accrued and striking their foreign sovereign immunity defense as a sanction pursuant to Fed. R. Civ. P. 37(b) for their persistent failure to provide jurisdictional discovery.  Defendants argue that the challenged order exceeded the district court's discretion, particularly because their submissions of Belarusian law established their sovereign immunity defense as a matter of law.

Plaintiffs respond that we lack jurisdiction to consider this interlocutory appeal.  In any event, they maintain that the challenged sanction order was within the district court's discretion because defendants' claim of sovereign immunity raises unresolved questions of fact on which they were entitled to jurisdictional discovery.

3

We have jurisdiction to review this appeal pursuant to the collateral order doctrine. On such review, we conclude that the district court acted within its discretion in ordering limited jurisdictional discovery and in sanctioning defendants for failing to comply with that order. At the same time, however, we conclude that, to the extent the challenged October 20, 2015 order not only required defendants to pay an earlier accrued monetary sanction but also struck their sovereign immunity claim in its entirety, it exceeded the district court's discretion. The latter sanction risked the district court's assumption of jurisdiction where it may, in fact, have been lacking, something the court was not empowered to do, particularly where, as here, alternative sanctions are available. Accordingly, we affirm the challenged order generally, vacating only that part striking defendants' foreign sovereign immunity claim, and we remand the case to the district court for further proceedings consistent with this opinion.

## I. **Background**

### A. The Abduction Giving Rise to this Action

The following facts are drawn from plaintiffs' first amended complaint, which was operative at the time of the challenged rulings.

4

Plaintiff Zeltser, a United States citizen, represented a group of investors who, in the late 1990s and early 2000s, purchased a block of stock in BNTK, a Belarusian petrochemical cooperative, and secured an option to acquire a controlling interest in that concern. BUSA is a Massachusetts corporation, which acts as BNTK's representative in the United States.

In 2006 and 2007, the United States imposed sanctions on members of the Belarusian government, including head of state Alexander Lukashenko, and on certain Belarusian entities, including defendants.[1] Soon thereafter, defendants abrogated their agreement with Zeltser's clients and refused to compensate them for the breach. Plaintiffs threatened legal action, and a series of meetings ensued as the parties attempted to resolve their dispute.

In March 2008, defendants' representatives met twice with Zeltser and his assistant Funk in New York City to explore settlement. After Zeltser and Funk

---

[1] *See* Exec. Order No. 13,405, 71 Fed. Reg. 35,485 (June 16, 2006) (determining that sanctions were appropriate because "actions and policies of certain members of the Government of Belarus and other persons to undermine Belarus' democratic processes or institutions, manifested most recently in the fundamentally undemocratic March 2006 elections, to commit human rights abuses related to political repression, including detentions and disappearances, and to engage in public corruption, including by diverting or misusing Belarusian public assets or by misusing public authority, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States").

declined to travel to Belarus for a further meeting, the parties convened in London on March 11, 2008. There, plaintiffs assert that they were drugged, kidnapped, and, ultimately, flown to Belarus under the alleged supervision of defendants' representatives.

In Belarus, plaintiffs were placed in a government detention facility where they were tortured and denied adequate food, water, and medicine. Defendants' representatives allegedly observed and directed this mistreatment in an effort to coerce Zeltser to surrender documents relating to his clients' BNTK investments and to convince those clients to renounce their stake in BNTK. Funk was also pressured to sign a confession implicating Zeltser in economic espionage. At some point during plaintiffs' captivity, Belarusian authorities issued a statement declaring that plaintiffs had been convicted of attempted economic espionage.

Meanwhile, a week after plaintiffs' abduction, New York's U.S. Senator Charles Schumer alerted the State Department to the abduction and requested aid in procuring plaintiffs' release. Over the next year, plaintiffs' situation attracted the attention of several private organizations as well as the national media. Funk was released on March 20, 2009, approximately one year after her abduction. Only after a United States congressional delegation traveled to

Belarus to demand Zeltser's release was he too freed from captivity on June 30, 2009.

### B. The Instant Lawsuit

#### 1. The Initial Pleadings and Motion To Dismiss

Plaintiffs initially filed this action on July 12, 2012, in New York State Supreme Court, demanding $140 million in damages for alleged assault and battery, intentional infliction of emotional distress, false imprisonment, interference with a contractual relationship and prospective economic advantage, conversion, and *prima facie* tort. On December 8, 2013, with defendants having failed to answer, plaintiffs moved for a default judgment. Before any action was taken on the motion, defendants appeared and, on January 16, 2014, removed the case to federal court and there moved for dismissal on the grounds that both subject-matter and personal jurisdiction were lacking.

Defendants invoked the FSIA to challenge subject-matter jurisdiction. *See* 28 U.S.C. § 1604 (providing that foreign state shall be immune from jurisdiction in federal and state courts in United States except as provided in 28 U.S.C. §§ 1605–1607). To support their immunity claim, defendants relied on plaintiffs' own initial complaint, which alleged that defendants were "the Belarusian

7

petrochemical monopoly owned by and controlled by the government of Belarus, Lukashenk[o], and other members of the Belarusian government." J.A. 21.

In opposition, plaintiffs argued that defendants had failed to carry their burden to make a *prima facie* showing that BNTK was indeed an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b). Plaintiffs also renewed their motion for default judgment or, in the alternative, urged that the foreign sovereign immunity issue be deferred to trial because defendants' claim of foreign state status presented disputes of fact.

2.    First Discovery Order

On December 31, 2014, the district court ruled both that defendants' motion to dismiss and plaintiffs' motion for default judgment were premature in light of factual questions on the threshold jurisdictional issue of whether BNTK qualifies as an agency or instrumentality of a foreign state. The court ordered limited jurisdictional discovery to allow the parties "to obtain the information necessary to supplement their motions or proceed to a hearing." J.A. 124.[2]

---

[2] The district court also identified the need for further factual development on the issue of whether defendants had been properly served. Because defendants subsequently waived that defense, we need not discuss it further here.

8

### 3. Discovery and Further Motion Practice

On the January 30, 2015 deadline set by the district court, plaintiffs submitted a proposed discovery plan. Rather than submitting a discovery plan, however, Defendants requested leave to renew and supplement their dismissal motion with the results of further investigation in Belarus. Given the parties' disagreement over the path forward, the district court itself set a discovery schedule, which provided for the parties to supplement their motions *after* the ordered discovery.

Instead, on March 23, 2015, defendants supplemented their motion to dismiss by filing a translated declaration from Dmitry Gvozdev ("Gvozdev Declaration"), an employee in BNTK's legal department, to which were attached purported provisions of Belarusian law. Defendants argued that these provisions convincingly established BNTK's status as an agency or instrumentality of Belarus under either the organ or ownership prongs of 28 U.S.C. § 1603(b)(2). The Gvozdev Declaration pointed, *inter alia*, to BNTK's charter declaring that its assets were the property of Belarus, to various resolutions of Belarus's Council of Ministers stating that BNTK was involved in the administrative management of Belarus's petrochemical industry, and to a

presidential decree declaring that "concerns" such as BNTK were part of the "system of Government" in Belarus. J.A. 152–53. The Declaration also stated that BNTK's chairperson is appointed by the Belarusian government and that the number of its employees, their salaries, and its budget are all set by that government. Defendants further submitted a United States Congressional Research Service report on Belarus that referred to BNTK as "state-owned." *Id.* at 145.

On April 28, 2015, plaintiffs filed an affidavit of Alexander Fishkin ("Fishkin Affidavit"), an attorney admitted to practice law in Belarus with avowed experience in translation. That affidavit states that defendants' production of Belarusian laws is "incomplete" and cannot be deemed controlling because unpublished decrees known as "Closed Circulars" can "super[s]ede published statutes" in Belarus. *Id.* at 297, 309 (internal quotation marks omitted). Fishkin further maintained that defendants' translations of Belarusian laws were "inaccurate, sometimes nearly to the point of changing their meaning to the opposite," *id.* at 297; *see, e.g., id.* at 299 (discussing defendants' mistranslation of "licensor" as "lessor"); that their submission did not, in any event, establish direct ownership of BNTK by Belarus, *see id.* at 302; and that BNTK in fact

10

"consist[s] of two components: commercial and non-commercial," with the former being "owned by individual corporate members . . . , which are joint-stock companies, including publicly traded companies" that "sell equity investments to private investors," *id.* at 298, 306.

In a joint letter dated June 3, 2015, the parties summarized their ongoing discovery disputes, with plaintiffs accusing defendants of "object[ing] to virtually every interrogatory and document request" and "declin[ing] to produce any person for deposition." *Id.* at 315. Plaintiffs maintained that further discovery was needed on multiple grounds, including "prov[ing] the existence of alter ego relationships" as between defendants and Lukashenko and as between BNTK and BUSA. *Id.* at 316. Plaintiffs also sought discovery to establish the commercial activity exception to foreign sovereign immunity and to show that BNTK is, in fact, a commercial entity owned by its private member companies.

4. <u>Second Discovery Order</u>

In a July 9, 2015 order ("Second Discovery Order"), the district court stated that defendants had properly objected to discovery requests unrelated to the threshold jurisdictional issue and appropriately responded to requests for documents on which they would rely. Nevertheless, because defendants had

11

failed to provide discovery "regarding [BNTK's] ownership and structure," to which plaintiffs were entitled, the district court ordered that defendants make such production by July 31, 2015, as well as identify a witness for deposition pursuant to Fed. R. Civ. P. 30(b)(6). *Id.* at 323.

5.      Further Discovery Disputes

On July 29, 2015, defendants supplemented their interrogatory responses to state that "[n]one of the constituent entities of [BNTK] is a subsidiary of [it]"; that BNTK's "constituent entities are independent legal entities over which [it] exercises certain state-related management and administrative responsibilities and functions"; and that those constituent entities "may be owned, in whole or in part, by the Republic of Belarus, or . . . by others, including private entities." *Id.* at 327. The next day, however, defendants appealed the Second Discovery Order to this court.

On July 31, the deadline set in the Second Discovery Order, plaintiffs moved for sanctions based on defendants' failure to provide documents showing BNTK's structure or ownership. In response to the district court's ensuing order to show cause why "substantial sanctions . . . should not be issued," including "monetary sanctions, deeming issues admitted, or precluding defendants from

12

proving issues on which they are alleged to have blocked discovery," Order, *Funk v. Belneftekhim*, No. 14-cv-376 (BMC) (E.D.N.Y. July 31, 2015), defendants argued that their appeal divested the district court of jurisdiction and, in any event, they had satisfied their *prima facie* burden as to the defense of foreign sovereign immunity.

### 6. First Sanctions Order

The district court was not persuaded and, in an order dated August 13, 2015 ("First Sanctions Order"), ruled that it was not divested of jurisdiction because its Second Discovery Order was not final and, therefore, defendants' appeal from that order was frivolous. As to sanctions, the district court observed that there could be "no dispute" that defendants had failed to produce ordered discovery and that the failure was "willful." J.A. 342. It concluded that defendants could not use sovereign immunity "manipulatively" to avoid providing plaintiffs with a fair opportunity to define issues of fact and law relevant to that immunity claim and the court with the full record needed to decide the issue. *Id.* Accordingly, it imposed a monetary sanction of $2,000 per day, payable to the Clerk of Court, which would run until defendants complied with the Second Discovery Order. It also imposed a one-time $5,000 sanction

payable to plaintiffs for having to litigate the discovery dispute. Finally, the district court warned that, absent compliance, it would consider additional sanctions, including orders of preclusion, denial of the pending motion to dismiss, and entry of a default judgment.

The following day, defendants appealed the First Sanctions Order. Denied a stay pending that appeal, defendants continued to defy the district court's Second Discovery Order, prompting plaintiffs to seek default judgment as a sanction.

On October 6, 2015, a motions panel of this court granted plaintiffs' motion to dismiss defendants' appeals from both the Second Discovery Order and the First Sanctions Order on the ground anticipated by the district court, *i.e.*, that neither order satisfied the finality requirement of 28 U.S.C. § 1291.

7.    Second Sanctions Order

On October 20, 2015, the district court granted plaintiffs' motion for further sanctions, but denied the requested default judgment, stating that it was "important to impose sanctions in a graduated manner and [to] avoid the most severe sanction unless nothing else will suffice." J.A. 360. Observing that "[m]onetary sanctions have not succeeded in inducing compliance" with its

discovery orders, the district court decided to "strike[] the sovereign immunity defense," in order to "restore the prejudiced party," *i.e.*, plaintiffs, "to the same position [they] would have been in absent the wrongful withholding of evidence" by defendants. *Id.* at 351, 359 (alterations and internal quotation marks omitted). The district court halted its earlier *per diem* monetary sanction, but ordered defendants to pay within two weeks the $136,000 in accumulated sanctions to the Clerk of Court, as well as the $5,000 litigation-expense sanction to plaintiffs.

When defendants appealed this Second Sanctions Order, plaintiffs again moved to dismiss, but that relief was denied without prejudice by a motions panel of this court. Meanwhile, plaintiffs filed an amended complaint in the district court and again moved for default judgment in light of defendants' continued noncompliance with discovery. Defendants moved to dismiss the amended complaint, but no decision was rendered because, after this court's denial of plaintiffs' motion to dismiss this appeal, the district court stayed further proceedings in this case.

## II. Discussion

### A. Appellate Jurisdiction

Plaintiffs challenge our jurisdiction to review the Second Sanctions Order on the ground that it is interlocutory rather than final as required by 28 U.S.C. § 1291. In urging otherwise, defendants invoke the collateral order doctrine, which allows interlocutory appeals from the small class of orders that "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978); s*ee Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (allowing interlocutory appeals from "small class" of orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated"); *accord United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 235 (2d Cir. 2016). The challenged Second Sanctions Order satisfies these requirements.

First, by striking defendants' foreign sovereign immunity claim, the district court removed the claim from the case, which effectively determined the

16

immunity issue against defendants as conclusively as if the court had ruled adversely on the motion to dismiss that raised it. This court has "consistently held that [a] threshold sovereign-immunity determination is immediately reviewable under the collateral-order doctrine." *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 87–88 & n.36 (2d Cir. 2015).

Second, whether a foreign sovereign immunity claim is struck or rejected, a defendant's professed entitlement to such immunity is an issue distinct from the merits of a plaintiff's underlying claims. Further, the importance of such immunity is the same in either circumstance, as it informs the district court's subject-matter jurisdiction. *See* 28 U.S.C. § 1330(a).

Third, whether a foreign sovereign immunity claim is struck from the case as a sanction or rejected as a ground for dismissal, the denial of immunity is effectively unreviewable after final judgment because defendants must litigate the case to reach judgment and, thus, lose the very immunity from suit to which they claim to be entitled. *See generally Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017) (observing "basic objective" of foreign sovereign immunity is "to free a foreign sovereign from *suit*" so that it should be decided "as near to the outset of the case as is reasonably possible"

17

(emphasis in original)); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) (recognizing sovereign immunity as "immunity from trial and the attendant burdens of litigation" (internal quotation marks omitted)).

Plaintiffs nevertheless maintain that Supreme Court precedent precludes application of the collateral order doctrine to Rule 37 discovery sanctions. *See Cunningham v. Hamilton County*, 527 U.S. 198, 200 (1999) (holding that monetary sanction imposed pursuant to then-Fed. R. Civ. P. 37(a)(4) is not appealable collateral order); *accord Linde v. Arab Bank, PLC*, 706 F.3d 92, 104–06 (2d Cir. 2013) (holding discovery sanction pursuant to Fed. R. Civ. P. 37(b) allowing jury to draw inference of misconduct is not appealable collateral order); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (observing that, in determining whether interlocutory order can be appealed, court's focus should be on "entire category to which a claim belongs" rather than on "individualized jurisdictional inquiry" (internal quotation marks omitted)).

The rule certainly applies to most discovery sanctions because, as *Cunningham* recognized, such sanctions are generally "inextricably intertwined with the merits of the action"; indeed, a determination as to the propriety of such sanctions will usually require an assessment of "the importance of the

18

information sought or the adequacy or truthfulness of a response." *Cunningham v. Hamilton County*, 527 U.S. at 205; *accord SEC v. Smith*, 710 F.3d 87, 94 (2d Cir. 2013) (stating, in holding monetary sanction under Fed. R. Civ. P. 11 not to be appealable collateral order, that *Cunningham* "relied heavily on the fact that review of sanctions orders could not remain entirely separate from the merits of the underlying litigation"). In *Smith*, however, this court referenced, without addressing, the possibility that "some types of sanctions may be immediately appealable if the rationale underlying the *Cunningham* decision does not apply." 710 F.3d at 95 n.8.

That is the case with respect to the discovery sanction here, which strikes the foreign sovereign immunity claim that was the singular object of discovery. Neither the ordered discovery nor the ensuing sanction was in any way informed by the merits of the underlying tort action. Indeed, the district court found that defendants acted properly in refusing, at this stage of the proceedings, to respond to discovery demands relating to anything other than the distinct issue of "whether [BNTK] qualifies as an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b)." J.A. 322 (internal quotation marks omitted).

Precedent has recognized that striking a sovereign immunity claim can be immediately appealable as a final order, at least where, as here, a party "asserts not merely immunity from judgment, but immunity from the burden of having to defend the claim" at all. *Ehre v. New York* (In re *Adirondack Ry. Corp.*), 726 F.2d 60, 62 (2d Cir. 1984) (holding that decision to strike sovereign immunity was not final order where state claimed immunity "to insulate it at most from a money judgment and not from the burden of litigating the trustee's claim" for declaratory judgment). In such circumstances, "appeal from final judgment cannot repair the damage that is caused by requiring the defendant to litigate." *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d at 756. Indeed, striking a claim of foreign sovereign immunity is the functional equivalent of denying such an assertion on its merits, and *Rein* held that the latter decision constitutes an appealable collateral order. *See id.*; *cf. also Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 2017 WL 2507341, at *9 n.7 (June 12, 2017) (stating that "order striking class allegations is 'functionally equivalent'" to appealable order denying class certification and thus is also appealable (alteration omitted)).

As for *Cunningham*'s concern with piecemeal litigation, *see* 527 U.S. at 209, that is necessarily outweighed here by Congress's decision to afford foreign

states immunity from the jurisdiction—not simply the judgments—of United States courts subject to certain statutory exceptions not at issue on this appeal. *See* 28 U.S.C. §§ 1330, 1604–1607. That conclusion is only reinforced by the narrowness of our decision today, which pertains only to a sanction that actually strikes a foreign sovereign immunity claim, not to lesser or distinct sanctions— *e.g.*, monetary or instructional—that may make it harder for a party that has failed to provide ordered jurisdictional discovery to support its immunity claim.

Plaintiffs further argue that the collateral order doctrine affords appellate jurisdiction to review adverse foreign sovereign immunity determinations only where sovereignty is undisputed or favorably adjudicated, that is, where an acknowledged sovereign is denied immunity under one of the statutory exceptions. The argument, unsupported by any authority, does not persuade us because this court has exercised appellate jurisdiction over interlocutory denials of sovereign immunity based solely on a finding that a party is not an agency or instrumentality of a foreign state under the FSIA. *See Filler v. Hanvit Bank*, 378 F.3d 213, 216–17 (2d Cir. 2004). Thus, we conclude that the collateral order doctrine can apply when foreign sovereign immunity is conclusively denied to a

party who invokes it to avoid the burden of litigation; it is not limited to foreign states denied immunity under an FSIA exception.

Finally, plaintiffs argue that only adverse immunity decisions turning exclusively on issues of law are immediately appealable. *See, e.g., Grune v. Rodriguez*, 176 F.3d 27, 32 (2d Cir. 1999) (holding that where appeal from denial of summary judgment based on qualified immunity does not turn on purely legal issue, but instead challenges district court's determination that dispute of material fact existed, appellate jurisdiction will not lie); *United States v. Yonkers Bd. of Educ.*, 893 F.2d 498, 502 (2d Cir. 1990) (collecting cases adopting proposition that "[d]enials of motions to dismiss on grounds of immunity . . . are not appealable . . . unless the immunity defense can be decided solely as a matter of law"). The point merits little discussion because the issue presented on this appeal is one of law, specifically, whether the district court, as a matter of law, exceeded its discretion in striking defendants' foreign sovereign immunity claim as a discovery sanction. That issue is distinct from and does not require us to decide whether defendants are actually entitled to immunity, a question that can present disputes of fact.

Accordingly, because (1) striking defendants' foreign sovereign immunity claim effectively denied defendants such immunity, (2) that immunity issue is distinct from the merits of plaintiffs' underlying tort claims and important to the case insofar as it informs the district court's jurisdiction, and (3) the issue is effectively unreviewable on appeal to the extent defendants will be forced to engage in the very litigation that immunity allows a foreign sovereign to avoid, we here conclude that we have jurisdiction under the collateral order doctrine to review the Second Sanctions Order challenged on this appeal.

B.     Second Sanctions Order

Rule 37 of the Federal Rules of Civil Procedure states that "[i]f a party . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders," including, *inter alia*, "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," and "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."  Fed. R.

Civ. P. 37(b)(2)(A)(i), (ii).[3] We accord deferential review to a district court's

imposition of Rule 37 discovery sanctions, and we will reverse only for abuse of

discretion, which we will not identify absent an error of law, a clearly erroneous

finding of fact, or a decision that cannot be located within the range of

---

[3] In its entirety, Rule 37(b)(2)(A) reads as follows:

> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(C) adds that "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

permissible options available to the district court. *See Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 143 (2d Cir. 2010); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 147–48 (2d Cir. 2016).

In imposing Rule 37 sanctions, as well as in reviewing a sanctions order for abuse of discretion, courts properly consider various factors, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance[;] and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d at 144 (internal quotation marks omitted); *see also id.* (observing that factors are "not exclusive"). In maintaining that the Second Sanctions Order manifests abuse of discretion, defendants argue generally that no jurisdictional discovery and, therefore, no sanctions were warranted because their submission of Belarusian law established their entitlement to foreign sovereign immunity as a matter of law. In any event, they argue that the sanction of striking their immunity claim exceeded the district court's discretion. We address each argument in turn.

25

1.     The District Court Acted Within Its Discretion in Ordering Jurisdictional Discovery

The Constitution extends federal judicial power to all cases "between a State, or the Citizens thereof, and foreign states, Citizens or Subjects."  U.S. Const. art. III, § 2, cl. 1.  Congress, however, has conferred such original jurisdiction on district courts to hear civil actions against foreign states only to the extent "the foreign state is not entitled to immunity" under either the FSIA or an international agreement.  28 U.S.C. § 1330(a).  Because sovereign immunity thus shields a foreign state from litigation, this court has cautioned that, "in the FSIA context, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination."  *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007) (internal quotation marks omitted); *see First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (observing that comity concerns involved in ordering foreign sovereign to produce discovery require "delicate balancing").  A district court is "typically within its discretion" to order jurisdictional discovery where a plaintiff has "made out a prima facie case for jurisdiction."  *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 401 (2d Cir. 2009) (internal quotation marks omitted).  At the same time, however, in the FSIA context, a

defendant asserting sovereign immunity to defeat jurisdiction has the initial burden to "present[] a prima facie case that it is a foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993).

The FSIA defines a "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality" of a foreign state (1) is a "separate legal person"; (2) which is an "organ" or "political subdivision" of a foreign state, or a majority of whose shares or ownership interest is held by a foreign state or political subdivision thereof; and (3) is neither a citizen of a state of the United States nor created under the laws of a third country. *Id.* § 1603(b).

To carry its *prima facie* burden, defendants initially relied only on plaintiffs' original complaint, which alleged defendants to be owned by and controlled by the government of Belarus.[4] Subsequently, they proffered the Gvozdev Declaration and its attachments purportedly showing, among other things, that (1) BNTK's assets are the property of Belarus, (2) BNTK's chairman is appointed by the Belarusian government and the number of its employees and their salaries are set by that government, (3) BNTK manages the Belarusian petrochemical

[4] Plaintiffs' amended complaint did not repeat this allegation.

27

industry and exclusively licenses trade in and sets prices for that country's petroleum products, and (4) BNTK provides regular reports of its activities to Belarusian government agencies. Further, defendants pointed to a United States Congressional Research Service report referring to BNTK as a state-owned entity. Defendants argue that these submissions did more than satisfy their *prima facie* burden; they established their entitlement to sovereign immunity as a matter of law.

In arguing otherwise, plaintiffs rely, as they did in the district court, on their complaint's assertion that they purchased an equity interest in BNTK from defendants, *see supra* at **[5]**; the Fishkin Affidavit's challenge to defendants' representations of Belarusian law and BNTK's status thereunder, *see supra* at **[10–11]**; and on a declaration from a reporter named Viktor Lushin, asserting that, in October 2006 interviews, BNTK executives told him that BNTK "was a commercial company owned by private investors and not by the government of Belarus," and that media "mischaracteriz[ations]" of BNTK as "government owned" had made it difficult "to solicit private investments," A.S.A. 71.[5]

---

[5] "A.S.A." refers to the "Appellees' Supplemental Appendix."

28

On this record, we identify no abuse of discretion in the district court's decision to order limited jurisdictional discovery as to BNTK's "ownership and structure." J.A. 323. While the Belarusian laws and related materials produced by defendants, viewed most favorably to them, support the argument that BNTK is an organ of, or an entity majority owned by, Belarus, plaintiffs provided adequate contrary evidence, both in the form of expert opinion and admissions attributed to defendants' own agents, to give rise to a colorable factual dispute on the "foreign state" issue. Further, the district court's discovery order was appropriately circumspect in limiting inquiry to the "specific facts" of ownership and structure that are "crucial to an immunity determination" in this case. *EM Ltd. v. Republic of Argentina*, 473 F.3d at 486 (internal quotation marks omitted); *see* J.A. 322–23 (stating that plaintiffs are "not entitled to discovery regarding *any* matter relevant to their claims" but only as to "threshold issue" of "whether [BNTK] qualifies as an agency or instrumentality of a foreign state," nor are plaintiffs "yet entitled to discovery" as to whether "commercial activity exception to sovereign immunity applies" (emphasis in original) (internal quotation marks omitted)).

Defendants' invocation of the act-of-state doctrine warrants no different conclusion. That doctrine precludes the courts of one state from "question[ing] the validity of public acts . . . performed by other sovereigns within their own borders." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004). As applied here, that doctrine may bar plaintiffs from challenging the validity of the proffered laws. It does not, however, preclude plaintiffs from disputing the completeness of defendants' legal proffer or the accuracy of their translations and, on that basis, questioning whether the submitted provisions of Belarusian law say what defendants maintain they say. Nor does the act-of-state doctrine preclude inquiry into the still-opaque operational and ownership structure of BNTK to determine whether it is reasonably viewed as having two components, at least one of which is a privately owned commercial entity.

With such material factual issues raised, but not answered, by the parties' conflicting submissions, defendants cannot persuasively maintain that they established sovereign immunity as a matter of law or that "[p]laintiffs' discovery requests do not relate to facts that would change the immunity determination." Appellants' Br. 31. Thus, their argument that the district court exceeded its discretion in ordering any jurisdictional discovery in this case fails on the merits.

2.    The Sanctions Imposed

We now consider whether defendants' failure to obey the district court's Second Discovery Order warranted sanctions, including the particular sanction of striking defendants' foreign sovereign immunity defense to subject-matter jurisdiction.

The district court issued the First Sanctions Order on August 13, 2015, after defendants failed to meet the July 31, 2015 deadline for document discovery set in the Second Discovery Order. The First Sanctions Order required defendants to pay $2,000 to the Clerk of Court for every day they failed to provide the ordered discovery, as well as $5,000 in litigation costs to plaintiffs. When defendants persisted in resisting the Second Discovery Order as well as the monetary sanction for an additional two months, the district court concluded that the monetary sanction was ineffective and, on October 20, 2015, issued a Second Sanctions Order halting accrual of the monetary sanction (though requiring defendants to pay the amounts owing to date) and, instead, striking defendants' foreign sovereign immunity defense.

We identify no abuse of discretion in the district court's conclusion that Rule 37 sanctions, in general, were warranted in this case. In imposing both its

First and Second Sanctions Orders, the district court specifically found that defendants' failure to comply with the Second Discovery Order was "willful." J.A. 342 (First Sanctions Order); *id.* at 359–60 (Second Sanctions Order). Defendants do not challenge that factual finding, which is amply supported by the record. Thus, the first factor identified in *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d at 144, weighs strongly in favor of sanctions.

A second factor, the duration of defendants' noncompliance, is more equivocal as the duration was not inordinately long: slightly over a month in the case of the First Sanctions Order and an additional two months in the case of the Second Sanctions Order. *Cf. id.* at 128 (upholding default and contempt sanctions where discovery battle had lasted more than two years). This does not, however, mean that the factor necessarily weighs against sanctions. We have never held that a district court, confronted with willful defiance of its discovery orders, must wait any particular time before imposing *a* sanction. Rather, the length of defiance can inform the propriety of a particular sanction. *See, e.g., Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 303 (2d Cir. 2009) (upholding dismissal sanction where failure to produce ordered discovery persisted for six months). Where, as here, the district court found that defendants willfully failed

32

to comply with a second discovery order for a month, it did not exceed its discretion in then imposing a coercive monetary sanction in an effort to induce compliance. Defendants themselves could have halted the sanction on any day by complying with the court's order.

Instead, defendants continued willfully to violate both the Second Discovery Order and the First Sanctions Order for another two months. In these circumstances, a total of three months of defiance was sufficient to allow the district court to conclude that defendants "never intended to comply with . . . any of the Court's discovery orders," J.A. 359; that a monetary sanction would not induce compliance; and that a different sanction, one aimed at "put[ting] plaintiffs in the same position they might have been in had defendants complied" with the Second Discovery Order, was warranted, *id.* at 360; *see Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1360–67 (2d Cir. 1991) (upholding sanction deeming facts established and precluding introduction of defense evidence where defendant's conduct over roughly two weeks made clear that it would not comply with court's production order).

A third factor relevant to a sanctions decision is warning. *See Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d at 144. As this court has

recognized, "[d]ue process requires that courts provide notice and an opportunity to be heard before imposing *any* kind of sanctions." *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 270 (2d Cir. 1999) (emphasis in original) (internal quotation marks omitted). In general, such notice should alert the party to the "particular sanction" under consideration. *SEC v. Razmilovic*, 738 F.3d 14, 24 (2d Cir. 2013) ("No sanction should be imposed without giving the disobedient party notice of the particular sanction sought and an opportunity to be heard in opposition to its imposition."). Nevertheless, we have excused the lack of sanction-specific notice in certain circumstances. *See, e.g.*, *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 452–53 (2d Cir. 2013) (upholding Rule 37(b) default-judgment sanction against defendant who had received six sanction warnings as well as copy of plaintiff's order to show cause for default judgment, although no sanctions warning specifically referenced default judgment).

In here affording defendants notice and an opportunity to be heard on plaintiffs' initial July 31, 2015 motion for sanctions, the district court warned of three possible actions: "monetary sanctions, deeming issues admitted, or precluding defendants from proving issues on which they are alleged to have blocked discovery." Order, *Funk v. Belneftekhim*, No. 14-cv-376 (BMC) (E.D.N.Y.

34

July 31, 2015).  In its First Sanctions Order, imposing monetary sanctions, the district court warned that "in the event defendants continue their non-compliance" with discovery, still further sanctions were possible, "including" not only the previously mentioned "orders of preclusion," but also "denial of the [defendants'] pending motion [to dismiss], or a default judgment" in favor of plaintiffs.  J.A. 343.

Neither of these orders specifically referenced *striking* defendants' foreign sovereign immunity defense to jurisdiction.  But to the extent (1) defendants had blocked discovery on the single issue of their status as a foreign state entitled to sovereign immunity and (2) their pending motion to dismiss was based in part on the purported lack of subject-matter jurisdiction based on foreign sovereign immunity, there was little practical difference—for purposes of notice—between, on the one hand, warning defendants that (a) they could be precluded from offering proof of their claimed foreign-state status or (b) a motion dependent on that status could be denied, and, on the other hand, warning them that the foreign sovereign immunity basis for their motion could be struck.  Thus, the warning factor here satisfactorily supports the district court's decision to impose further sanctions.

35

That leaves us with a single question: Did the district court exceed its discretion in imposing the *particular* sanctions identified in its Second Sanctions Order? That question is akin, although not identical, to a fourth-factor inquiry as to the efficacy of lesser sanctions. *See Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d at 144.

To the extent the Second Sanctions Order required defendants to pay the monetary sanctions that had accumulated under the First Sanctions Order as well as a litigation-expense sanction imposed by that order, we conclude that the district court acted well within its discretion. As neither of these sanctions had induced plaintiffs' compliance with ordered discovery, there is no reason to think any lesser sanction would have been more effective. More to the point, defendants were not entitled to be absolved of monetary sanctions willfully incurred under the First Sanctions Order during the two months they persisted in defying the Second Discovery Order. Accordingly, we affirm that part of the Second Sanctions Order requiring defendants to pay their monetary obligations under the First Sanctions Order.

We cannot reach the same conclusion with respect to that part of the Second Sanctions Order striking defendants' foreign sovereign immunity defense

to jurisdiction. In *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155 (2d Cir. 2012), this court held that a sanction striking a claim for damages based on a plaintiff's late filing of expert disclosures, despite numerous extensions, constituted an abuse of discretion requiring vacatur, *see id.* at 156–57. We explained that "striking [plaintiff's] request for damages reflects a harsh sanction, one akin to dismissing the action altogether," so that "we apply the same standards as we would have if the district court dismissed the case instead." *Id.* at 159. That standard permits such a harsh sanction "only in extreme circumstances" and "after consideration of alternative, less drastic sanctions." *Id.* (internal quotation marks omitted).

The sanction imposed on defendants here is not exactly akin to the dismissal of a plaintiff's complaint. Still, the harshness of the sanction is comparable in that it effectively denied defendants a jurisdictional defense that could have allowed them to avoid litigating plaintiffs' case in its entirety. Indeed, the sanction here is more troubling insofar as striking a jurisdictional challenge, rather than rejecting it on the merits, risks a district court's exercise of jurisdiction where none may exist. Such a sanction exceeds a district court's discretion to issue "just orders." Fed. R. Civ. P. 37(b)(2)(A).

As this court has recognized, "sovereign immunity (or, more precisely, the absence of sovereign immunity) is an element of subject matter jurisdiction under the FSIA." *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d at 763; *see also id.* (reiterating that foreign sovereign immunity is "matter of direct jurisdictional moment" and not simply "affirmative defense to suits under the FSIA"). *Rein* reached this conclusion without regard to the fact that the sovereign immunity jurisdictional limitation derives from statute rather than the Constitution. *See generally Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 313 (2d Cir. 1981) (locating "constitutional basis for the statutory exercise of subject matter jurisdiction" under FSIA in suit brought by U.S. plaintiff in U.S. Const. art. III, § 2, cl. 1, which grants federal courts diversity jurisdiction over suits between state, or citizens thereof, and foreign states).

Federal courts are not empowered to confer subject-matter jurisdiction on themselves. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) ("The district courts of the United States, as we have said many times, are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." (internal quotation marks omitted)); *see generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (observing with reference

to both statutory and constitutional elements of jurisdiction that for court to render decision in absence of jurisdiction "is, by very definition, for a court to act ultra vires"); *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000) ("It is axiomatic that federal courts are courts of limited jurisdiction and may not decide cases over which they lack subject matter jurisdiction."). Thus, in *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121 (2d Cir. 1999), this court held that, in the absence of subject-matter jurisdiction, a district court did not have the power to sanction a party's failure to comply with discovery and other procedural orders by dismissing its complaint with prejudice, *see id.* at 124.

*Hernandez* reached this conclusion against the background of an express ruling that Article III rather than statutory subject-matter jurisdiction was there lacking. *See id.* at 123; *Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 38–40 (2d Cir. 1997) (identifying lack of both diversity and federal question jurisdiction in earlier appeal in same case). Here, the disputed question of subject-matter jurisdiction arises under the FSIA, and the district court issued no merits ruling. Rather, by striking defendants' foreign sovereign immunity claim as a discovery sanction, the court mooted that jurisdictional challenge. Insofar as defendants were thus denied FSIA immunity, based not on a merits finding that they failed

39

to come within its scope, but as a discovery sanction, a concern arises that the district court may have conferred subject-matter jurisdiction on itself where it may have been lacking. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d at 763 (observing that "power to abrogate (or confer) sovereign immunity is, under the FSIA, therefore the power to confer (or abrogate) jurisdiction"). This exceeds a district court's sanctioning discretion, particularly where alternatives are available.[6]

Among those alternatives are (1) according an evidentiary presumption against defendants that withheld discovery would refute their claim that BNTK is an organ or instrumentality of Belarus, and (2) prohibiting defendants from offering further supporting evidence on that issue. *See* Fed. R. Civ. P.

---

[6] In this case, we do not deal with an exercise of "hypothetical jurisdiction," where distinctions between statutory and constitutional jurisdiction have been recognized. *See In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 497 (2d Cir. 2002) (holding that bar on exercise of "hypothetical jurisdiction" applies where possible lack of jurisdiction poses "constitutional question" (internal quotation marks omitted)). Even in the statutory context, we have assumed hypothetical jurisdiction only to dismiss a clearly meritless claim, not to allow it to go forward as the challenged striking sanction would do here. *See, e.g., Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 132 n.10 (2d Cir. 2005); *Center for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 195 (2d Cir. 2002); *see also Ortiz-Franco v. Holder*, 782 F.3d 81, 86 (2d Cir. 2015) (stating that hypothetical jurisdiction is "prohibited in all but the narrowest circumstances").

37(b)(2)(A)(i), (ii). Such sanctions would have served the district court's proper objective to restore plaintiffs "insofar as possible" to the position they would have been in absent defendants' discovery defiance. J.A. 359 (internal quotation marks omitted). For example, defendants' failure to provide discovery as to BNTK's structure and ownership could support a presumption that the withheld evidence would have confirmed the Fishkin Affidavit's representation that BNTK has two components, one of which operates as a privately owned commercial enterprise. That failure would further support precluding defendants from offering structure and ownership evidence to the contrary.[7]

On such a record, defendants' foreign sovereign immunity claim might well fail. Thus, the practical difference between an evidentiary sanction and one striking defendants' foreign sovereign immunity claim may appear small. Not so, however, their jurisdictional effect. Evidentiary sanctions could shape, even limit, the factual record. But the district court would still have to make a merits ruling from that record on defendants' foreign sovereign immunity claim. In short, it would have to decide its jurisdiction, not assume it. Courts routinely

---

[7] These examples are intended to be illustrative, not exhaustive, of the available evidentiary sanctions.

decide issues based on limited records when parties—for whatever reason—are unable to locate or produce all the evidence relevant to a point in dispute. By contrast, a discovery sanction that strikes an FSIA claim without regard to its merits risks a court's assumption of jurisdiction that might be lacking.

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982), requires no different conclusion. There, the Supreme Court upheld a discovery sanction that deemed established jurisdictional facts relating to personal jurisdiction. *See id.* at 705–06. The Court observed that the personal jurisdiction requirement affords an individual right, which can be waived. *See id.* at 702–04. At the same time, the Court cautioned that a similar conclusion might not apply to facts establishing subject-matter jurisdiction. *See id.* at 701–02. The Court's focus, however, was on Article III, which "functions as a restriction on federal power, and contributes to the characterization of the federal sovereign." *Id.* at 702. As earlier noted, there is no question that Article III jurisdiction extends to actions against foreign states. *See* U.S. Const. art. III, § 2, cl. 1; *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983). Such foreign sovereign immunity limitations as are imposed on the exercise of such jurisdiction are created by statute and, by statute, can be waived "either

42

explicitly or by implication." 28 U.S.C. § 1605(a)(1). Thus, we do not understand

*Insurance Corp. of Ireland* to limit a district court's discretion in imposing

*evidentiary* sanctions on defendants here for failing to produce ordered discovery

relevant to their FSIA challenge to jurisdiction.[8]

In sum, because the sanction striking defendants' FSIA claim raises

concerns about judicial assumption of jurisdiction, which can be avoided with

lesser efficacious sanctions shaping the evidentiary record, we conclude that

imposition of the striking sanction here exceeded the district court's Rule 37(b)

---

[8] In light of the availability of these evidentiary sanctions, we do not here decide whether a case could ever arise in which persistent discovery violations could be found to manifest a waiver of foreign sovereign immunity sufficient to support a court's striking the FSIA challenge to jurisdiction even over the asserting party's objection. *See generally Cabiri v. Gov't of Malaysia*, 165 F.3d 193, 201 (2d Cir. 1999) (observing that waiver of foreign sovereign immunity will usually be implied only where state's intent to waive is unambiguous).

Insofar as plaintiffs urged us at oral argument to interpret the district court's striking of defendants' FSIA claim as the equivalent of it accepting plaintiffs' opposing facts as established and, therefore, of it resolving the immunity claim against defendants on the merits, we are not convinced the Second Sanctions Order reasonably admits such a reading. If that was the district court's intent, however, it can certainly clarify the point on remand. Alternatively, it can consider anew the possibility of evidentiary sanctions and an FSIA ruling based on a record shaped by such sanctions.

discretion. We therefore vacate the Second Sanctions Order only insofar as it strikes defendants' foreign sovereign immunity challenge to jurisdiction.

C.      Remand Challenge

Defendants argue that the identification of sanction error in this case does not warrant remand because this court can decide that, as a matter of law, defendants established their foreign sovereign immunity claim. We decline this invitation because, like the district court, we think that the record on appeal reveals material factual disputes as to both the organ and ownership prongs of the foreign state definition in 28 U.S.C. § 1603(b)(2). Moreover, on remand, these issues may be recast if the district court imposes evidentiary sanctions for defendants' discovery violations, or obviated by discovery and findings as to whether defendants fall within any of the FSIA's statutory exceptions to sovereign immunity. *See generally Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (holding that, in assessing FSIA jurisdiction, district court should "review the allegations in the complaint, the undisputed facts, if any, placed before it by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolve disputed issues of fact, with the defendant foreign sovereign shouldering the burden of

persuasion"). The district court can decide in the first instance whether to consider additional documents submitted by BNTK after the filing of this appeal.

Accordingly, we remand the case for further proceedings consistent with this opinion.

## III. <u>Conclusion</u>

To summarize, we conclude as follows:

1. Pursuant to the collateral order doctrine, we have appellate jurisdiction to review the Second Sanctions Order striking defendants' foreign sovereign immunity claim because it conclusively determines an important question separate from the merits, which is effectively unreviewable on appeal from final judgment. *See Coopers & Lybrand v. Livesay*, 437 U.S. at 468.

2. Because the parties' submissions present disputes of material fact as to BNTK's foreign sovereign immunity claim, the district court acted within its discretion in ordering jurisdictional discovery.

3. Having reasonably found defendants to have willfully failed to produce ordered discovery and having adequately warned defendants of the serious sanctions that could result from their persisting in that failure, the district court acted within its discretion under Fed. R. Civ. P. 37(b) in ordering daily

monetary sanctions and litigation costs in an initial effort to induce discovery compliance and, when that failed, in requiring defendants to pay the accumulated monetary sanctions in its Second Sanctions Order.

4.  Defendants' continued discovery violations despite monetary sanctions supported the district court's conclusion that more severe sanctions were warranted. The chosen sanction striking defendants' FSIA challenge to jurisdiction, without regard to its merits, however, exceeded the court's Rule 37(b) discretion because it raised concerns about the court's assumption of jurisdiction that may, in fact, have been lacking. Those concerns could have been avoided by lesser efficacious sanctions shaping the evidentiary record in advance of a merits decision on the foreign sovereign immunity claim.

Accordingly, the Second Sanctions Order is AFFIRMED in part and VACATED in part, and the case is REMANDED for further proceedings consistent with this opinion.