20-3499-cr
*United States v. Bankasi*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2020

No. 20-3499-cr

UNITED STATES OF AMERICA,
*Appellee,*

v.

TURKIYE HALK BANKASI A.S., AKA HALKBANK,
*Defendant-Appellant,*

REZA ZARRAB, AKA RIZA SARRAF, CAMELIA JAMSHIDY, AKA KAMELIA
JAMSHIDY, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, AKA CAN
SARRAF, AKA KARTALMSD, MEHMET HAKAN ATILLA, MEHMET ZAFER
CAGLAYAN, ABI, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH
HAPPANI,
*Defendants.*

Appeal from the United States District Court
for the Southern District of New York

ARGUED: APRIL 12, 2021
DECIDED: OCTOBER 22, 2021

———————

Before: KEARSE, CABRANES, and BIANCO, *Circuit Judges*.

———————

This case presents two questions. First, whether a denial of a motion to dismiss a criminal indictment based on the Foreign Sovereign Immunities Act ("FSIA") is immediately appealable under the collateral order doctrine. Second, whether FSIA confers immunity on foreign sovereigns from criminal prosecutions. We answer the first question in the affirmative. As to the second, we hold that even if we were to assume that FSIA confers immunity in the criminal context, the offense conduct with which Defendant-Appellant Turkiye Halk Bankasi A.S. is charged would fall under the commercial activity exception to FSIA. Accordingly, we **DENY** the Government's motion to dismiss this appeal, and we **AFFIRM** the Decision and Order of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*).

———————

SIDHARDHA KAMARAJU (Michael D. Lockard, David W. Denton, Jr., Jonathan E. Rebold, Thomas McKay, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the

Southern District of New York, New York, NY, *for Appellee.*

SIMON A. LATCOVICH (Robert M. Cary, Eden Schiffmann, James W. Kirkpatrick, *on the brief*), Williams & Connolly, LLP, Washington, D.C., *for Defendant- Appellant.*

---

JOSÉ A. CABRANES, *Circuit Judge*:

This case presents two questions. First, whether a denial of a motion to dismiss a criminal indictment based on the Foreign Sovereign Immunities Act ("FSIA") is immediately appealable under the collateral order doctrine. Second, whether FSIA confers immunity on foreign sovereigns from criminal prosecutions. We answer the first question in the affirmative. As to the second, we hold that even if we were to assume that FSIA confers immunity in the criminal context, the offense conduct with which Defendant-Appellant Turkiye Halk Bankasi A.S. ("Halkbank") is charged would fall under the commercial activity exception to FSIA. Accordingly, we **DENY** the Government's motion to dismiss this appeal, and we **AFFIRM** the Decision and Order of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*).

## I. BACKGROUND

Halkbank is a commercial bank that is majority-owned by the Government of Turkey.

In 2019 a grand jury returned a Superseding Indictment (the "Indictment") charging Halkbank with participating in a multi-year scheme to launder billions of dollars' worth of Iranian oil and natural gas proceeds in violation of U.S. sanctions against the Government of Iran and Iranian entities and persons. The oil and natural gas proceeds were held in Halkbank accounts on behalf of the Central Bank of Iran ("CBI"), the National Iranian Oil Company ("NIOC"), and the National Iranian Gas Company ("NIGC").[1]

The Indictment alleged that Halkbank knowingly facilitated certain types of illegal transactions, including: (1) "allowing the proceeds of sales of Iranian oil and gas deposited at Halkbank to be used to buy gold for the benefit of the Government of Iran"; (2) "allowing the proceeds of sales of Iranian oil and gas deposited at Halkbank to be used to buy gold that was not exported to Iran";[2] and

---

[1] It is not disputed that the CBI, NIOC, and NIGC were all subject to U.S. sanctions during the charged offense conduct or indictment period.

[2] The National Defense Authorization Act for Fiscal Year 2012 (the "2012 NDAA"), Pub. L. No. 112-81, requires the imposition of sanctions on foreign financial institutions following a determination by the President that the institution has violated certain prohibitions on activities with respect to the Central Bank of Iran or another Iranian financial institution designated under the International Emergency Economic Powers Act ("IEEPA"). *See generally* U.S. Dep't of the Treasury, *Frequently Asked Questions: Iran Sanctions*, available at https://home.treasury.gov/policy-issues/financial-sanctions/faqs/topic/1551 (last accessed August 17, 2021) (FAQs 169-70). Government-owned foreign financial institutions, like Halkbank, are prohibited from engaging in transactions for the sale or purchase of petroleum or petroleum products to or from Iran. *See id* (FAQ 170). Under the terms of the 2012 NDAA, foreign countries could be exempted from sanctions for purchasing Iranian oil so long as they significantly reduced their

(3) "facilitating transactions fraudulently designed to appear to be purchases of food and medicine by Iranian customers, in order to appear to fall within the so-called 'humanitarian exception'[3] to certain

purchases of such products from Iran, the so-called "significant reduction exception." *See id.* (FAQ 235).

Section 504 of the Iran Threat Reduction and Syria Human Rights Act of 2012, 22 U.S.C. §§ 8711, *et seq.*, ("ITRA") narrowed the significant reduction exception "to (a) exempt from sanctions only transactions that conduct or facilitate bilateral trade in goods or services between the country granted the exception and Iran, and (b) require that funds owed to Iran as a result of the bilateral trade be credited to an account located in the country granted the exception and not be repatriated to Iran," or the "bilateral trade restriction." *See* U.S. Dep't of the Treasury, *Frequently Asked Questions: Iran Sanctions* (FAQs 254-55). Under this provision, as is relevant here, the proceeds of oil sales by Iran to another country, like Turkey, are to be deposited in an escrow account in the purchasing country and may only be used by Iran for further trade with that country (*i.e.*, for trade between Turkey and Iran). *See* 22 U.S.C. § 8513a(d)(4)(D). Subsequently, under the Iran Freedom and Counter-Proliferation Act ("IFCA"), passed as part of the National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, sanctions may apply to foreign financial institutions that conduct or facilitate a transaction for the sale, supply, or transfer of natural gas to or from Iran unless, as with proceeds from Iran's oil sales, any funds owed to Iran as a result of the trade are credited to an account located in the purchasing country. *See* U.S. Dep't of the Treasury, *Frequently Asked Questions: Iran Sanctions* (FAQs 297, 313).

[3] The 2012 NDAA included an exception for transactions for the sale of food, medicine, or medical devices to Iran. *See id*. (FAQ 641) ("Transactions for the sale of agricultural commodities, food, medicine, or medical devices to Iran involving the [CBI] are excepted from the relevant sanctions under section 1245(d)(2) of the NDAA 2012 and sections 561.203 and 561.204 of the Iranian Financial Sanctions Regulations. . . . ").

5

sanctions against the Government of Iran, when in fact no purchases of food or medicine actually occurred."[4]

Through the charged scheme, Halkbank allegedly transferred approximately $20 billion of otherwise restricted Iranian funds in order to create a "pool of Iranian oil funds . . . held in the names of front companies, which concealed the funds' Iranian nexus."[5] These funds were then used to make international payments on behalf of the Government of Iran and Iranian banks, including at least $1 billion in dollar-denominated transfers that passed through the U.S. financial system in violation of U.S. law.

Further, Halkbank executives, acting within the scope of their employment and for the benefit of Halkbank, are alleged to have concealed the true nature of the transactions Halkbank made on behalf of the Government of Iran from officials at the U.S. Department of the Treasury (the "Treasury").[6] To conceal these transactions, Halkbank

---

[4] Indictment ¶ 4.

[5] *Id*. ¶¶ 4, 6.

[6] These executives included: (1) Halkbank's former General Manager, Suleyman Aslan; (2) Halkbank's former Deputy General Manager for International Banking, Mehmet Hakan Atilla, who was responsible for maintaining Halkbank's correspondent banking relationships, including with U.S. correspondent banks, and for maintaining Halkbank's relationships with Iranian banks, including the Central Bank of Iran; and (3) the former head of Halkbank's Foreign Operations Department, Levent Balkan. These individual defendants are not parties to the present appeal; the Government informs us that Aslan and Balkan were charged separately and remain at large, while Atilla was convicted, following a jury trial, of

officers allegedly conspired with Reza Zarrab, an Iranian-Turkish businessman, and other Turkish and Iranian government officials, some of whom are alleged to have received millions of dollars from the proceeds of the scheme in exchange.[7]

Halkbank was charged in the six-count Indictment with: conspiring to defraud the United States by obstructing the lawful functions of the Treasury, in violation of 18 U.S.C. § 371 (Count One); conspiring to violate or cause violations of licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. §§ 1701-06 (Count Two); bank fraud, in violation of 18 U.S.C. § 1344 (Count Three); conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Four); money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Count Five); and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Six).

On August 10, 2020, Halkbank moved to dismiss the Indictment, arguing that FSIA renders it immune from criminal prosecution because it is majority-owned by the Turkish Government.[8] Halkbank

---

offenses charged separately. *See United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020); Gov't Br. at 4-5 n.2.

[7] Zarrab pleaded guilty to the charges against him in relation to this scheme on October 26, 2017.

[8] The parties do not dispute that Halkbank is an "instrumentality of a foreign state" for purposes of FSIA. *See* Halkbank Br. at 8. Under FSIA, an "instrumentality of a foreign state" includes "any entity" for which "a majority of [its] shares or other ownership interest is owned by a foreign state." 28 U.S.C.

further argued that FSIA's exceptions to immunity are applicable only in civil cases—not in criminal cases—and that, in any event, even if FSIA's exceptions did apply in the criminal context, the conduct with which Halkbank is charged does not fall within the ambit of FSIA's so-called "commercial activity" exception. Finally, even if FSIA did not bar its prosecution, Halkbank argued that it was nevertheless entitled to immunity from prosecution under the common law.

Following briefing and oral argument, the District Court denied Halkbank's motion in a Decision and Order dated October 1, 2020. The District Court principally concluded that Halkbank was not immune from prosecution because FSIA confers immunity on foreign sovereigns only in civil proceedings. The District Court went on to conclude that, even assuming *arguendo* that FSIA did confer immunity to foreign sovereigns in criminal proceedings, Halkbank's conduct would fall within FSIA's commercial activity exception. The District Court also rejected Halkbank's contention that it was entitled to immunity from prosecution under the common law, noting that Halkbank failed to cite any support for its claim on this basis. Halkbank timely appealed.

On appeal, Halkbank moved to stay the District Court proceedings pending resolution of this appeal, which the Government opposed. The Government then moved to dismiss Halkbank's appeal, taking the position that the District Court's denial of Halkbank's

§ 1603(b)(2). For purposes of this opinion, we use foreign sovereign and foreign state interchangeably.

motion to dismiss the Indictment on the basis of foreign sovereign immunity is not subject to interlocutory review by our Court.

A motions panel of our Court granted Halkbank's motion for a stay and referred the decision on the Government's motion to dismiss to the merits panel.

## II. DISCUSSION

*A. Appellate Jurisdiction*

As a threshold matter, we must consider whether we have jurisdiction over this appeal, which is taken from the District Court's denial of Halkbank's motion to dismiss the Indictment on the basis of foreign sovereign immunity.

The Government challenges our jurisdiction, asserting that the District Court's sovereign immunity determination is neither a final judgment nor an order that qualifies for interlocutory appeal. We do not agree.

While Congress has limited our jurisdiction to "final decisions of the district courts,"[9] we have recognized a narrow exception to the final judgment rule that permits interlocutory appeals from certain "collateral orders." It is well established that, to qualify for interlocutory appeal under the collateral order doctrine, a decision must: (1) "conclusively determine the disputed question"; (2) "resolve an important issue completely separate from the merits of the action";

---

[9] 28 U.S.C. § 1291.

and (3) "be effectively unreviewable on appeal from a final judgment."[10]

We have "consistently held that [a] threshold [foreign] sovereign-immunity determination is immediately reviewable under the collateral-order doctrine."[11] But, as the Government points out, our holding on this point concerned a sovereign immunity determination in the civil, not criminal, context. Because the Supreme Court has made clear that the collateral order doctrine is to be applied in criminal cases with the "utmost strictness,"[12] the Government argues that a threshold sovereign immunity determination in a criminal case cannot qualify for the collateral order exception to the final judgment rule.

It is true that the Supreme Court has "emphasized that one of the principal reasons for . . . strict adherence to the doctrine of finality in criminal cases is that the Sixth Amendment guarantees a speedy

---

[10] *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978), *superseded on other grounds by* Fed. R. Civ. P. 23(f).

[11] *Funk v. Belneftekhim*, 861 F.3d 354, 363 (2d Cir. 2017) (first alteration in original) (internal quotation marks omitted).

[12] *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (internal quotation mars omitted). Indeed, the Supreme Court has recognized just four categories of orders that are immediately appealable in criminal cases: (1) denials of motions to reduce bail; (2) denials of motions to dismiss on double-jeopardy grounds; (3) denials of motions to dismiss under the Speech or Debate Clause, and (4) orders for the forced medication of criminal defendants. *See id.*; *Sell v. United States*, 539 U.S. 166, 176-77 (2003).

trial."[13] Still, that the Supreme Court has not *yet* held that a sovereign immunity determination in a criminal case falls within the collateral order doctrine does not necessarily foreclose that outcome.[14]

Indeed, where, as here, a sovereign immunity determination in the criminal context plainly satisfies the criteria set forth by the Supreme Court in *Coopers & Lybrand*, applied with the "utmost strictness," it qualifies for interlocutory review. First, the District Court's sovereign immunity determination conclusively determined the issue against Halkbank.[15] Second, Halkbank's professed entitlement to immunity is an issue distinct from the merits of the charges at issue.[16] Third, an "appeal from [a] final judgment cannot repair the damage caused to a sovereign that is improperly required to litigate a case."[17] Put another way, "the denial of immunity is effectively unreviewable after final judgment because defendants

---

[13] *United States v. MacDonald*, 435 U.S. 850, 861 (1978) (internal quotation marks and alteration omitted).

[14] Our Circuit has also held that commitment orders, *United States v. Magassouba*, 544 F.3d 387, 400 (2d Cir. 2008), and orders allowing the government to try a juvenile as an adult, *United States v. Doe*, 49 F.3d 859, 865 (2d Cir. 1995), are immediately appealable in criminal cases.

[15] *See Funk*, 861 F.3d at 362-63.

[16] *See id*. at 363.

[17] *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 87 (2d Cir. 2015); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017) (observing that the "basic objective" of foreign sovereign immunity is "to free a foreign sovereign from *suit*" so that it should be decided "as near to the outset of the case as is reasonably possible" (emphasis in original)).

11

must litigate the case to reach judgment and, thus, lose the very immunity from suit to which they claim to be entitled."[18]

In sum, we hold that a threshold sovereign immunity determination is immediately appealable pursuant to the collateral order doctrine—even in a criminal case. Accordingly, we have jurisdiction to review the District Court's sovereign immunity determination.

## B. *Subject Matter Jurisdiction*

On appeal, Halkbank principally contends that the District Court lacks subject matter jurisdiction because it has sovereign immunity from criminal prosecution under § 1604 of FSIA, which grants immunity to foreign sovereigns "from the jurisdiction of the courts of the United States," unless a statutory exception applies.[19]

### i. *Standard of Review*

On appeal, "[w]e review *de novo* a district court's legal determinations regarding its subject matter jurisdiction, such as whether sovereign immunity exists, and its factual determinations for clear error."[20]

---

[18] *Funk*, 861 F.3d at 363.

[19] 28 U.S.C. § 1604.

[20] *Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 203 (2d Cir. 2018) (internal quotation marks omitted).

## ii. *The Foreign Sovereign Immunities Act*

It is well established that Article III of the United States Constitution grants federal courts jurisdiction to hear claims involving "foreign States."[21] Still, for most of our history, foreign sovereigns enjoyed absolute immunity in U.S. courts as "a matter of grace and comity"[22] in light of the "perfect equality and absolute independence of sovereigns."[23] Accordingly, federal courts "consistently . . . deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities."[24] In practice, the U.S. Department of State would routinely make requests for immunity in all actions against "friendly sovereigns."[25]

Then, in 1952, the Acting Legal Adviser to the State Department, Jack B. Tate, issued a letter announcing the State Department's adoption of a so-called "restrictive" theory of foreign sovereign immunity.[26] Under this theory, the State Department would take the

---

[21] U.S. CONST. art. III, § 2, cl. 1.

[22] *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983).

[23] *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812).

[24] *Verlinden*, 461 U.S. at 486.

[25] *Samantar v. Yousef*, 560 U.S. 305, 312 (2010).

[26] Letter from Jack B. Tate, Acting Legal Adviser, Dep't of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dep't of State Bull. 984–85 (1952) *and in Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711-15 (1976) (App'x 2 to opinion of White, *J.*).

position that foreign sovereigns were not immune from liability in U.S. courts for acts that are "private or commercial in character (*jure gestionis*)"; rather, foreign sovereigns would only enjoy immunity for their "sovereign or public acts (*jure imperii*)."[27] The State Department's new position threw immunity determinations for foreign sovereigns into "disarray."[28] Indeed, foreign nations lobbied the State Department for immunity, with the result that "political considerations sometimes led the Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory."[29] And, when foreign nations did not request immunity from the State Department, the federal courts were left to "determine whether sovereign immunity existed, generally by reference to prior State Department decisions."[30] As a result, "sovereign immunity determinations were made in two different branches, subject to a variety of factors [that] sometimes include[d]

---

[27] *Saudi Arabia v. Nelson*, 507 U.S. 349, 359-60 (1993).

[28] *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004).

[29] *Id*. (internal quotation marks omitted); *see also* Curtis A. Bradley & Jack L. Goldsmith, *Foreign Sovereign Immunity, Individual Officials, and Human Rights Litigation*, 13 GREEN BAG 2D 9, 19 (2009) ("[T]he pre-FSIA common law regime of executive discretion in determining foreign sovereign immunity" was "characterized by unprincipled conferrals of immunity based on the political preferences of the presidential administration and case-by-case diplomatic pressures.")

[30] *Altmann*, 541 U.S. at 690 (internal quotation marks omitted).

diplomatic considerations" and "the governing standards were neither clear nor uniformly applied."[31]

As discussed in a recent case, the consequent "inconsistent application of sovereign immunity" attracted Congressional notice.[32] In 1976 Congress enacted FSIA to "endorse and codify the [State Department's] restrictive theory of sovereign immunity" and to "transfer primary responsibility for deciding claims of foreign states to immunity from the State Department to the courts."[33] Under § 1604 of FSIA, foreign sovereigns are "immune from the jurisdiction of the courts of the United States,"[34] with certain exceptions, including an exception for the "commercial activity" of a foreign sovereign.[35] FSIA also grants subject matter jurisdiction to federal district courts over "any nonjury civil action against a foreign state . . . to which the foreign state is not entitled to immunity."[36]

### iii. FSIA in the Criminal Context

---

[31] *Id*. at 691 (internal quotation marks omitted).

[32] *Samantar*, 560 U.S. at 313.

[33] *Id*. (internal quotation marks omitted); *see also* 28 U.S.C. § 1602 (setting forth Congressional findings and the purposes of FSIA).

[34] 28 U.S.C. § 1604 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.").

[35] *Id*. § 1605(a)(2).

[36] *Id*. § 1330(a).

By enacting FSIA, Congress established a comprehensive framework "governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities."[37] By its terms, FSIA plainly confers immunity on foreign sovereigns from civil actions—albeit with certain exceptions.[38] What is less clear, however, is whether Congress also intended for FSIA to confer immunity on instrumentalities of foreign sovereigns in criminal cases.[39]

Halkbank takes the position that § 1604 of FSIA confers immunity on foreign sovereigns and their instrumentalities from criminal prosecution. In particular, Halkbank argues that § 1604, which confers immunity (with enumerated exceptions) on foreign sovereigns "from the jurisdiction of the courts of the United States," must be read "in tandem"[40] with a separate provision of FSIA, § 1330(a), which grants district courts jurisdiction over "any nonjury

---

[37] *Verlinden*, 461 U.S. at 488.

[38] *See* 28 U.S.C. § 1330(a).

[39] Other circuits to consider FSIA's availability in criminal cases have split. *Compare Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1215 (10th Cir. 1999) (concluding in the context of a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim that if Congress intended defendants such as the Republic of Nigeria "to be immune from criminal indictment under the FSIA, Congress should amend the FSIA to expressly so state"), *and United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997) (same, in a case involving head-of-state immunity), *with Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 820 (6th Cir. 2002) (considering FSIA in the context of civil RICO, but holding that FSIA does apply to criminal cases).

[40] *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

*civil* action against a foreign state."[41] Thus, Halkbank urges that, the *absence* of any express grant of criminal jurisdiction over foreign sovereigns in § 1330(a), combined with § 1604's general grant of immunity to foreign sovereigns from the jurisdiction of U.S. courts, necessarily leads to the conclusion that foreign sovereigns and their instrumentalities are immune from criminal prosecution.

As an initial matter, to the extent Halkbank's challenge rests on the idea that FSIA is the sole basis for the District Court's subject matter jurisdiction over this criminal prosecution, that premise is incorrect.[42] It is true that we have held, in the civil context, that "FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."[43] But federal district courts have "original jurisdiction, exclusive of the courts of the States, of *all* offenses against the laws of the United States" pursuant to § 3231 of Title 18 of the U.S. Code.[44] As one of our sister circuits recently observed, "[i]t is hard to imagine a clearer textual grant of subject-matter jurisdiction" — "'[a]ll'

---

[41] 28 U.S.C. § 1330(a) (emphasis added).

[42] In support of this proposition Halkbank relies on *Amerada Hess*, in which the Supreme Court wrote that "the text and structure of FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts." 488 U.S. at 434. But *Amerada Hess* was a civil case and neither our Court nor the Supreme Court has ever extended this holding to a criminal case.

[43] *Barnet as Tr. of 2012 Saretta Barnet Revocable Tr. v. Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 199 (2d Cir. 2020) (internal quotation marks omitted).

[44] 18 U.S.C. § 3231 (emphasis added).

17

means 'all.'"[45] Indeed, § 3231 "contains no carve-out" that supports an exemption for federal offenses committed by foreign sovereigns, and "nothing in the [FSIA's] text expressly displaces [§] 3231's jurisdictional grant."[46]

Although Halkbank argues that § 1604's broad grant of sovereign immunity cuts back on § 3231's grant of criminal jurisdiction, that logic is unavailing. Indeed, we agree with our sister circuit that (in an analogy we now understand all too well in this time of global pandemic) "granting a particular class of defendants 'immunity' from jurisdiction has no effect on the scope of the underlying jurisdiction, any more than a vaccine conferring immunity from a virus affects the biological properties of the virus itself."[47]

We think that the District Court plainly has subject matter jurisdiction over the federal criminal prosecution of Halkbank pursuant to § 3231. However, we need not—and do not—decide whether § 1604 of FSIA confers immunity on foreign sovereigns in the criminal context. As we explain below, even assuming *arguendo* that FSIA confers sovereign immunity in criminal cases, the offense

---

[45] *In re Grand Jury Subpoena*, 912 F.3d 623, 628 (D.C. Cir. 2019).

[46] *Id.*

[47] *Id.*

conduct with which Halkbank is charged falls within FSIA's commercial activities exception to sovereign immunity.[48]

*iv.   FSIA's Commercial Activity Exception to Sovereign Immunity*

The Government submits that, even assuming that FSIA confers immunity to foreign sovereigns in criminal cases, Halkbank's charged offense conduct would fall within FSIA's exception to sovereign immunity for commercial activity. We agree.

Section 1605(a)(2) of FSIA, the statute's commercial activity exception, provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case" in which the action is based upon (1) "a commercial activity carried on in the United States by the foreign state"; (2) "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "upon an act outside the territory of the United States in connection with a commercial activity

---

[48] We also note that, although Halkbank takes the position that FSIA's § 1604 confers sovereign immunity in criminal cases, it also takes the position that FSIA's exceptions to sovereign immunity, which are set forth in § 1605, are *not* available in criminal proceedings. Under this reasoning, a foreign sovereign could be liable under FSIA's commercial activity exception in the civil context, but immune from criminal liability for the same commercial conduct. We are skeptical that Congress intended for § 1604's grant of immunity to sweep far more broadly in criminal cases than in civil cases. Further, the text of § 1605 plainly states that FSIA's exceptions to foreign sovereign immunity apply "in *any* case." 28 U.S.C. § 1605(a) (emphasis added). Just as "all" means "all," so must "any" mean "any."

of the foreign state elsewhere and that act causes a direct effect in the United States."[49]

To fall within the commercial activity exception, Halkbank's activities need to qualify for at least one of the categories specified in the three clauses of § 1605(a)(2).

We begin this inquiry by identifying an "act of the foreign sovereign [s]tate" that is "'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit."[50] Here, the Indictment alleges that Halkbank "participated in the design of fraudulent transactions intended to deceive U.S. regulators and foreign banks" in order to launder approximately $1 billion in Iranian oil and gas proceeds through the U.S. financial system.[51] The Indictment further alleges that Halkbank lied to Treasury officials regarding the nature of these transactions in an effort to hide the scheme and avoid U.S. sanctions. This conduct plainly constitutes the "gravamen" of the charges against Halkbank.

---

[49] 28 U.S.C. § 1605(a)(2).

[50] *Petersen Energía*, 895 F.3d at 204 (quoting *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015)); *see also Barnet*, 961 F.3d at 200 ("We first must identify [the] predicate act that serves as the basis for plaintiff's claims.") (internal quotation marks omitted).

[51] Indictment ¶¶ 1, 64.

We next consider whether the identified act took place inside or outside the United States, and whether the act constitutes commercial activity within the meaning of FSIA.

FSIA defines "commercial activity" in a circular manner, as meaning "either a regular course of commercial conduct or a particular commercial transaction or act."[52] But FSIA does go on to provide that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."[53] In applying this provision of FSIA, we have held that "*purpose* is the reason why the foreign state engages in the activity and *nature* is the outward form of the conduct that the foreign state performs or agrees to perform."[54] Put another way, "the issue is whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in trade and traffic or commerce."[55] Whether a foreign state acts in the manner of a private party to engage

---

[52] 28 U.S.C. § 1603(d).

[53] *Id*.

[54] *Pablo Star Ltd. v. Welsh Government*, 961 F.3d 555, 561 (2d Cir. 2020) (emphasis added) (other emphases and internal quotation marks omitted).

[55] *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (emphasis in original) (internal quotation marks omitted). We note that such commercial activity has "been held to include criminal acts if those actions are ones in which private parties could engage and if they are committed in the course of business or trade, including illegal contracts to steal money, bribery, forgery, and mail, wire, and securities fraud." Restatement (Fourth), The Foreign Relations Law of the United States § 454 rn. 3.

21

in commercial activity is thus "a question of behavior, not motivation."[56]

Here, Halkbank's alleged offense conduct qualifies as commercial activity under all three categories set forth in § 1605(a)(2).

As to the first two clauses of § 1605(a)(2), Halkbank's activities in the United States—that is, Halkbank's communications with Treasury officials, including communications made in meetings and in conference calls, in furtherance of its efforts to evade U.S. sanctions—qualify under both. Although Halkbank is majority-owned by the Government of Turkey, such communications are plainly the *type* of activity in which banks, including privately owned correspondent banks, routinely engage.[57] Just as in *Pablo Star*, where we observed that "[l]iterally anyone can do"[58] copyright infringement, so, too, can literally any bank violate sanctions. Halkbank's interactions with the Treasury were therefore "commercial activity carried on in the United States" or, in the alternative, "act[s] performed in the United States in connection with a commercial activity . . . elsewhere"—specifically, its banking activities in Turkey on behalf of the Government of Iran.[59]

As to the third clause of § 1605(a)(2), Halkbank's activities outside the United States—Halkbank's participation in schemes to

---

[56] *Nelson*, 507 U.S. at 360.

[57] *Cf. Weltover*, 504 U.S. at 614.

[58] *Pablo Star*, 961 F.3d at 562.

[59] 28 U.S.C. § 1605(a)(2).

launder Iranian oil and gas proceeds through non-U.S. transactions[60]—also qualify as commercial activities for the same reasons. In addition, such activities were Halkbank's "commercial activit[ies] . . . elsewhere" that nevertheless caused a "direct effect" in the United States by causing victim-U.S. financial institutions to take part in laundering over $1 billion through the U.S. financial system in violation of U.S. law.[61]

With respect to the third clause, Halkbank argues that its activities outside the United States were "sovereign, not commercial" because the Government of Turkey has designated Halkbank as its "sole repository of proceeds from the sale of Iranian oil to Turkey's national oil company and gas company," consistent with applicable U.S. laws.[62] But we rejected a similar argument in *Pablo Star*. In that case, we were faced with a copyright dispute over the Welsh Government's use of the likeness of the poet Dylan Thomas in its promotional materials. The Welsh Government urged us to characterize its activities as promoting Welsh culture and tourism

---

[60] These transactions included purchases of gold using Iranian oil and gas proceeds as well as transactions fraudulently disguised as purchases of food and medicine, which would have fallen under a "humanitarian exception" to the U.S. sanctions regime. Indictment ¶ 4.

[61] 28 U.S.C. § 1605(a)(2).

[62] Halkbank Br. at 40-41 (internal quotation marks omitted); *see also supra* note 2, at 5 (explaining that the ITRA amended the 2012 NDAA to require the proceeds of Iranian oil sales between Iran and another country, like Turkey, to be deposited in a specified account in that country to only be used for trade with that country).

pursuant to a statutory mandate—activity that it asserted was distinctly "sovereign" in nature that would qualify for immunity under FSIA.[63] We declined to do so, observing that the Welsh government's broad characterization of its activities "conflate[s] the act with its purpose."[64]

Here, Halkbank's broad characterization of its activities as sovereign in nature also "conflates the act with its purpose." The gravamen of the Indictment is not that Halkbank is the Turkish Government's repository for Iranian oil and natural gas proceeds in Turkey, *i.e.*, the *purpose* for which it held these funds. Rather, it is Halkbank's participation in money laundering and other fraudulent schemes designed to evade U.S. sanctions that is the "core action taken by [Halkbank] outside the United States."[65] And because those core acts constitute "an activity that could be, and in fact regularly is, performed by private-sector businesses," those acts are commercial, not sovereign, in nature.[66]

Halkbank also argues that its activities elsewhere did not have a "direct effect" in the United States. That is plainly not the case. We find a direct effect if "an effect simply followed as an immediate

---

[63] *Pablo Star*, 961 F.3d at 562.

[64] *Id*. This reflects a fundamental issue with the *nature-purpose* distinction, which is that its "application may sometimes depend on the level of generality at which the conduct is viewed." *Id*. at 561.

[65] *Barnet*, 961 F.3d at 200 (internal quotation marks omitted).

[66] *Pablo Star*, 961 F.3d at 562.

consequence of the defendant's activity."[67] That effect "need not be substantial or foreseeable."[68] Again, Halkbank's activities outside the United States led to approximately $1 billion being laundered through the U.S. financial system.

In sum, even assuming *arguendo* that FSIA confers immunity on the instrumentalities of foreign sovereigns in the criminal context, Halkbank's charged offense conduct would fall within FSIA's commercial activity exception to sovereign immunity.

## C. *Common Law Immunity*

Halkbank argues that even if FSIA does not confer foreign sovereign immunity in criminal cases, it is nevertheless immune from criminal prosecution under common law. We do not agree.

Assuming *arguendo* that FSIA does confer sovereign immunity in criminal cases—a holding we do not reach today—its enactment displaced any pre-existing common-law practice.[69] Further, even assuming that FSIA did not supersede the pertinent common law, any foreign sovereign immunity at common law also had an exception for

---

[67] *Barnet*, 961 F.3d at 199 (internal quotation marks and alteration omitted).

[68] *Peterson Energía*, 895 F.3d at 205.

[69] *See, e.g.*, *Samantar*, 560 U.S. at 312-13; *Amerada Hess*, 488 U.S. at 435 (recognizing the "general rule that the [FSIA] governs the immunity of foreign states in federal court" (internal quotation marks omitted)).

a foreign state's commercial activity,[70] just like FSIA's commercial activity exception.

Finally, in any event, at common law, sovereign immunity determinations were the prerogative of the Executive Branch; thus, the decision to bring criminal charges would have necessarily manifested the Executive Branch's view that no sovereign immunity existed.[71]

## III.   CONCLUSION

To summarize, we hold as follows:

(1) We have jurisdiction over the instant appeal pursuant to the collateral order doctrine;

(2) Even assuming FSIA applies in criminal cases—an issue that we need not, and do not, decide today—the commercial activity exception to FSIA would nevertheless apply to Halkbank's charged offense conduct; thus, the District Court did not err in denying Halkbank's motion to dismiss the Indictment; and

---

[70] *See, e.g.*, *Verlinden*, 461 U.S. at 487-88. Under the restrictive view of immunity under customary international law, "states are generally required to afford immunity from jurisdiction to adjudicate to foreign states in respect to claims arising out of government activities . . . but not in respect to claims arising out of activities of a kind carried on by private persons . . . including commercial activities." Restatement (Fourth), The Foreign Relations Law of the United States § 454 cmt. h.

[71] *See Verlinden*, 461 U.S. at 486.

(3) Halkbank, an instrumentality of a foreign sovereign, is not entitled to immunity from criminal prosecution at common law.

For the foregoing reasons, we **DENY** the Government's motion to dismiss this appeal, and we **AFFIRM** the District Court's Decision and Order dated October 1, 2020.